ROBERT D. CARROLL (*pro hac vice* forthcoming)
*RCarroll@goodwinlaw.com*
**GOODWIN PROCTER** LLP
100 Northern Avenue
Boston, MA 02210
Tel.: +1 617 570 1000

ANDREW S. ONG (SBN 267889)
*AOng@goodwinlaw.com*
**GOODWIN PROCTER** LLP
601 Marshall Street
Redwood City, CA 94063
Tel.: +1 650 752 3100

TIMOTHY KEEGAN (*pro hac vice* forthcoming)
*TKeegan@goodwinlaw.com*
**GOODWIN PROCTER** LLP
620 Eighth Avenue
New York, NY 10018
Tel.: +1 212 813 8800

ISHIKA DESAI (SBN 340239)
*IDesai@goodwinlaw.com*
**GOODWIN PROCTER** LLP
525 Market Street, Floor 32
San Francisco, CA 94105
Tel.: +1 415 733 6316

Attorneys for Plaintiff
BRAVE SOFTWARE, INC.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| BRAVE SOFTWARE, INC., <br><br> Plaintiff, <br><br> v. <br><br> NEWS CORPORATION d/b/a NEWS CORP, DOW JONES & CO., INC., NYP HOLDINGS, INC., NEWS CORP UK & IRELAND LTD., NEWS CORP AUSTRALIA, <br><br> Defendants. | Case No. 25-2503 <br><br> **BRAVE SOFTWARE, INC.'S COMPLAINT FOR DECLARATORY JUDGMENT OF (1) NO COPYRIGHT INFRINGEMENT, (2) COPYRIGHT MISUSE, AND (3) NO BREACH OF CONTRACT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Brave Software, Inc. ("Brave") brings this action for declaratory judgment of no copyright infringement, copyright misuse, and no breach of contract against Defendants News Corporation d/b/a News Corp ("News Corp"), Dow Jones & Co. ("Dow Jones"), NYP Holdings, Inc. ("NYP Holdings"), News Corp UK & Ireland Limited ("News Corp UK"), and News Corp Australia (collectively, "Defendants").

## **PRELIMINARY STATEMENT**

1.      Defendants, companies that earn billions of dollars in annual revenue selling publications such as the *Wall Street Journal* and the *New York Post*, are engaged in an anticompetitive bullying campaign, built on an incorrect legal premise, to enrich themselves.

2.      Defendants' erroneous interpretation of the law, if applied, would set a precedent copyright holders could wield to eliminate search engines, and—at minimum—to prevent any company from offering a new search engine, restricting the search market, and ultimately consumer choice, to only the largest incumbent Big Tech search engines, Google Search and Microsoft's Bing. And by targeting Brave, the only privacy-focused search engine, instead of Google or Microsoft's Bing search engines that collect and leverage user data and which have well-documented privacy issues, Defendants also have waged a war on privacy.  This is, as a result, a case of significant consequence.

3.      As it stands today, there are tremendous barriers to entering the search engine market, which is dominated by Google, a company that holds nearly 90% of the market.  The remaining market share is dominated by Microsoft's Bing, which also powers search engines like Yahoo and DuckDuckGo (making them alternatives to Big Tech in name only).  Brave stands alone in the market as a search engine alternative to Big Tech in the United States.  And it took Brave over 10 years of research and development efforts and costs to build its technology and obtain the search volume it has today, which is substantial and growing but still represents less than 1% of the market. Defendants, which partner with Google, seek to bully Brave out of the market and push the market's already-high barriers to entry infinitely higher.

4.      Defendants claim, in a cease-and-desist letter accusing Brave of infringement, threatening legal action, and demanding "compensation," that maintaining a search engine that

directs users to their publicly available websites is copyright infringement. They contend that indexing their website content, which all search engine operators must do to exist, is copyright infringement and breaches their websites' terms of service.

5.    Defendants' allegations are wrong. Decades of legal precedent and practice confirm that it is not copyright infringement to index website content to maintain a search engine. Instead, it is fair use. Indeed, all four statutory fair use factors weigh in favor of fair use. That is because Brave interacts with Defendants' content, much of which is not copyright-protected, in a transformative way—to operate a search engine, which none of Defendants do. Moreover, Defendants' copyrighted works, largely news articles, are heavily factual. Brave also uses only an amount of the works necessary to operate a search engine and to respond to specific search queries. Importantly, the search results Brave provides cite the sources from which information is provided and direct users to those hyperlinked sources. Thus, Brave's search engine directly benefits Defendants by driving internet traffic to their websites, providing additional avenues for Defendants to convert users into subscribers and make money from advertising.

6.    There is no basis in contract law for Defendants' allegations that Brave has breached their terms of service, which they claim prohibit and restrict Brave's ability to access and extract data as necessary to operate a search engine. These terms of service are preempted by the federal Copyright Act as a matter of law. And Brave never agreed to these browse-wrap and click-wrap terms of service, which are contracts of adhesion that violate public policy.

7.    All told, Defendants' effort to leverage their flawed allegations to bully Brave into ceasing its fair use and paying extortionate "compensation" for past use of Defendants' content is copyright misuse, and it threatens to kill competition in the search engine market.

8.    Nearly 30 years ago, in 1998, Congress enacted the Digital Millennium Copyright Act, which provided a safe harbor from copyright infringement liability for search engine providers because Congress recognized that "the [i]nternet . . . made it possible for information—including valuable American copyrighted works—to flow around the globe in a matter of hours," and, as a

consequence, copyright law needed to be "set . . . up to meet the promise and the challenge of the digital world."[1]

9.      Defendants' threats and demands that Brave cease its lawful conduct necessary to operate a search engine, if allowed to stand by the Court, would create a precedent that copyright holders could wield to destroy search engines, thereby depriving the public of the many benefits of search engines that Congress recognized nearly 30 years ago.  And even if search engines were not destroyed entirely, the search market would become (even more) prohibitively expensive to enter, effectively reserving the space exclusively for Microsoft and Google, two multi-trillion dollar companies.

10.     Defendants' allegations also threaten to disrupt the development of generative artificial intelligence ("GenAI"), a nascent technology many consider to be as important as the development of the internet and the most important innovation of our generation.

11.     GenAI chatbots, including OpenAI's popular ChatGPT and Google's Gemini, rely on responses from search engines, which are provided to the chatbots through APIs, to give users accurate, up-to-date responses to their questions.  Defendants contend that this use of the Brave search engine—which is legally no different from the search functionality described above—is also copyright infringement.

12.     This case, as a result, is of great importance.  As explained, Defendants' accusations and demands threaten to bully Brave out of the search market.  The effect of those threats, if successful, will bully others out as well, drastically impacting the search market and the development of GenAI.

13.     Brave filed this lawsuit because it will not yield to Defendants' bullying and illegal demands, which find no basis in the law.

---

[1] 144 Cong. Rec. S11,889 (daily ed. Oct. 8, 1998) (statement of Sen. Orrin Hatch).

1

## **INTRODUCTION**

2    14.    Brave offers a search engine called Brave Search, a fast-growing alternative to

3  Google, the dominant search engine that currently holds nearly 90% of the search engine market

4  share, and Bing, the Microsoft search engine that holds most of the remainder of the market.[2]

5    15.    Brave is one of three American companies to build search engine technology at scale.

6  The other two entities are Google and Microsoft—two Big Tech giants, each valued at over $2

7  trillion (more than many countries).  As Judge Amit P. Mehta explained in his August 5, 2024

8  opinion finding that Google is a monopolist and has violated Section 2 of the Sherman Act, the

9  federal antitrust law, other search engines, like DuckDuckGo and Yahoo, are ostensibly competitors

10  but they actually "syndicate their search results from Bing."[3]  In other words, Brave represents the

11  only true search engine alternative to Google and Microsoft.[4]

12    16.    Brave has gained a foothold in the search engine space and begun to take some of

13  Google's and Microsoft's market share because it offers a revolutionary product: a search engine

14  that provides lightning-fast, accurate responses without compromising user privacy.  Brave does not

15  sell, share, or even collect its users' personal data.  This is a significant differentiator from other

16  search engines, which have been repeatedly maligned for their invasive privacy policies.[5]  This

17

18

---

19  [2] StatCounter, *Search Engine Market Share Worldwide – February 2025*,
20  https://gs.statcounter.com/search-engine-market-share.

21  [3] *See United States v. Google LLC*, 747 F. Supp. 3d 1, 38 (D.D.C. 2024).

    [4] *See id.*

22

23  [5] *See, e.g.*, Imran Rahman-Jones, BBC, *Critics Say New Google Rules Put Profits Over Privacy*
  (Feb. 15, 2025), https://www.bbc.com/news/articles/cm21g0052dno (calling Google's new rules

24  on user tracking and IP address collection, referred to as fingerprinting, "a blow to privacy because
  it is harder for users to control what data is collected about them."); Paul Monckton, Forbes, *Your*

25  *Google Search History Could Soon Be Accessed By Google's Gemini AI* (Mar 10, 2025),
  https://www.forbes.com/sites/paulmonckton/2025/03/10/googles-gemini-ai-could-soon-gain-full-

26  access-to-your-search-history/ (describing an "experimental [Google] Gemini Personalization
  model" which would allow Google's chatbot to access and respond based on users' search

27  histories.  "The privacy concerns should here should be obvious. Our search histories say a lot
  about us, and automated tools, especially powerful AI-based ones, significantly increase the ease

28  with which this most personal information can be exploited.").

includes reports that Google manipulates search results based on information it gathers on its users,[6] which is associated with the spread of misinformation.[7]  Users appreciate Brave's unique approach to their privacy concerns, which has led to Brave's growth.

17.    Brave, like the Google and Bing search engines, systematically browses, or "crawls," the publicly available internet to "discover" and catalog web content in a central database that can be drawn on to provide search results.  The cataloging process is known as "indexing," and this is what makes the web searchable and, thus, more accessible to consumers.  To be clear, Brave only accesses and indexes content that a provider has made available to all internet users.  For example, Brave never accesses or indexes content that a provider (a) places behind a paywall, (b) requires login and password information to access, or (c) has otherwise taken steps to prevent it from being accessed by labeling the content as not indexable through the use of a "noindex" tag.[8]

18.    The process also is essential to Brave's ability to extract, or "scrape," limited data from webpages, such as hyperlinked URLs and descriptions, that are presented to users via their search results page.  Brave also extracts limited data to create summaries to answer user queries as appropriate and to create limited "snippet" excerpts that appear below hyperlinked search results and provide short previews of linked third-party content.

19.    In the annotated screenshot of a Brave Search result page, a Brave Search summary is shown in the blue box and a snippet excerpt is shown in the green box:

---

[6] *See* Lawrence Meyers, CCN, *Google Manipulates Search Results, Former Engineer Shockingly Confirms* (June 8, 2023), https://www.ccn.com/google-manipulates-search-results-former-engineer-shockingly-confirms/ (report that Google presents users with different search results based on information Google gathers about users, including where a user is physically located).

[7] *See, e.g.*, Scientific American, Lauren Leffer, *How Search Engines Boost Misinformation* (Dec. 20, 2023), https://www.scientificamerican.com/article/how-search-engines-boost-misinformation/.

[8] *See, e.g.*, Sarah Berry, SEO.com, *What Is a Noindex Tag?  A Beginner's Guide to Noindex in SEO* (Nov. 13, 2023), https://www.seo.com/basics/glossary/no-index/ ("A noindex tag is a <meta> tag or robots directive instructing search engines not to index an HTML or non-HTML resources, like PDF, image, or video files.").



20.     As discussed in detail below, all search engines "crawl," index, summarize, and create snippets; these functions are core to the modern search engine.

21.     Defendants allege these functions constitute infringement of the many copyright-protected articles (each an individual "work") that Defendants make publicly available on their websites.  Defendants also allege that Brave's conduct violates their websites' terms of use, which prohibit "scraping," a process by which data can be extracted from webpages.

22.    Indexing allows Brave, like Google and Bing, to provide "search results" in response to user searches, or queries. Brave's search results include only information relevant to a user's query, including, for each webpage: a hyperlink; a timestamp; the title of the page; and one or more "snippets" of relevant text excerpted from the webpage.  To be clear, Brave provides users limited content (a) only from third-party sites that Google also indexes, (b) in response to search engine queries, (c) that is directly relevant to the query, and (d) that does not provide a user with the full content of any third-party work.  By providing the hyperlink and page title, Brave identifies the source of the information being provided (for example, Defendants' websites).  Brave does not purport to have created or own any of the third-party content that is linked in its search results.

23.    Brave's search result pages may also contain short, summarized answers to user queries as appropriate, like other search engines provide.  Brave's summaries are written in the form of a natural language response by an AI-powered feature that summarizes publicly available third-party content available on third-party webpages.  These summaries are accompanied by citations to the sources that were drawn on along with links to those websites.  Google and other search engines provide similar features.[9]

24.    Brave, like other search engines, is able to provide search results because Brave "indexes" much of the publicly available internet, including third-party websites.  Indexing is the process by which a search engine explores the web, discovers and analyzes website content, and then stores that information in a database called an index.  This allows the search engine to quickly retrieve and display relevant pages in search results when a user queries for information.  And indexing is what allows a search engine to organize and categorize web pages to make them easily searchable.  Indexing is what allows a search engine to provide a link to, for example, CNN.com, in

---

[9] Google Search Central, https://developers.google.com/search/docs/appearance/ai-overviews#:~:text=AI%20Overviews%20appear%20in%20Google,web%20and%20Google's%20Knowledge%20Graph ("AI Overviews appear in Google Search results when our systems determine that generative responses can be especially helpful . . . ."); Emma Roth, The Verge, *Bing's AI Redesign Shoves the Usual List of Search Results to the Side* (July 24, 2024), https://www.theverge.com/2024/7/24/24205404/bing-ai-search-redesign ("Bing's new search experience puts AI-generated answers front and center while pushing traditional search results to the side.").

7

response to a user's search for "CNN" or "Cable News Network." Notably, Brave's search results do not provide users with the full content or full text of any third-party webpage.

25.    As noted above, Brave provides search results that contain "snippets," which are short excerpts of third-party content specifically intended to be responsive to the user's query. Each snippet, with a maximum of 300 characters, represents, on average, less than 1% of third-party content. Snippet content is generated from the Brave Search index, as well as through an AI model that analyzes pages and extracts the snippet of text most relevant to the user's query. Brave's use of "snippets" in its search results is fair use and is similar to the snippets offered by other search engines, like Google and Bing, as part of their search engine results.[10]

26.    Unlike other search engines, Brave does not collect, share, and sell user data—a monetization avenue that other companies capitalize on, with serious consequences for user privacy. Brave does, however, take advantage of another traditional search engine monetization avenue leveraged by Defendants' partner Google and Bing: Brave provides third-party GenAI chatbots access to Brave's search functionality, via the Brave Search API offering. This allows third-party chatbots to essentially step into the shoes of a Brave search engine user. The chatbot can use Brave to search and leverage the search results, which include links to third-party webpages and snippets from those webpages, to identify information and third-party websites to draw on to respond to its users at the point of "inference"—the moment the chatbot "infers" an answer to the user's query based on data. This allows the chatbot to provide accurate, up-to-date responses to user queries. Google, Bing, and other search engines browse the internet to collect and use similar data for this precise purpose.[11]

---

[10] Google Search Central, *More Options to Help Websites Preview Their Content on Google Search* (Sept. 24, 2019), https://developers.google.com/search/blog/2019/09/more-controls-on-search ("Google uses content previews, including text snippets and other media, to help people decide whether a result is relevant to their query."); Barry Schwartz, Search Engine Roundtable, *Bing Search Result Snippets That Are Scrollable* (Sept. 18, 2024), https://www.seroundtable.com/bing-scrollable-search-result-snippets-38071.html.

[11] Google Cloud, *How Gemini for Google Cloud Works*, https://cloud.google.com/gemini/docs/discover/works#:~:text=The%20Gemini%20large%20language%20models,train%20the%20Gemini%20foundation%20models; Emma Roth, *Microsoft Reportedly Orders AI Chatbot Rivals to Stop Using Bing's Search Data* (Mar. 25, 2023), https://www.theverge.com/2023/3/25/23656336/microsoft-chatbot-rivals-stop-using-bing-search-

8

27.    Google uses Google's search engine functionality, as well as data from Google Search including the text of third-party webpages so its LLM, Google Gemini, can respond to user queries.  Google's Gemini already has a reported 13.5% share of the nascent and highly lucrative GenAI chatbot market, making it the third largest player in the space.[12]  Microsoft, which offers Bing, uses the Bing search engine and search data to power development of its LLM.[13]

28.    Unlike other search engines, Brave provides search functionality to anyone who signs up for its Brave Search API offering, which can be accessed for free in many cases, and in other cases for a small fee.  Brave's search APIs provide third-party chatbots with a valuable, affordable way to access search functionality.  And that's why companies, like Cohere, Mistral AI, Perplexity, and You.com, are coming to Brave.

29.    These third-party GenAI companies, and Brave by extension, represent serious competitive threats to Google, an entity that partners with Defendants.  But that potential competition with Google and other large incumbents would be seriously undermined if third-party GenAI companies were denied access to Brave's data.

30.    Notwithstanding the many benefits that Brave provides in the search engine and GenAI spaces, Defendants appear to seek to put Brave out of business.  Defendants' weapon of choice is their vast copyright portfolio, which consists of thousands of articles published in major newspapers and other publications, including the *Wall Street Journal* and *New York Post*.

31.    Defendants accused Brave of copyright infringement in a letter "to demand compensation for all past unauthorized use and sale by Brave of News Corp's copyrighted content,"

---

index ("Microsoft apparently draws the line at using Bing's search index as fodder for AI chatbots"); Andrew Hutchinson, *Meta Is Developing a Search Engine to Power Its AI Chatbot* (Oct. 28, 2024), https://finance.yahoo.com/news/meta-developing-own-search-engine-153903381.html.

[12] Medium, *The Best AI Chatbots for 2025: A Comprehensive Comparison*, https://medium.com/@ironhack/the-best-ai-chatbots-for-2025-a-comprehensive-comparison-4dad0d4a08c4.

[13] *See* Microsoft, Copilot in Bing: Our approach to Responsible AI (May 2024), https://support.microsoft.com/en-us/topic/copilot-in-bing-our-approach-to-responsible-ai-45b5eae8-7466-43e1-ae98-b48f8ff8fd44#:~:text=Copilot%20in%20Bing's%20intended%20uses,and%20within%20the%20chat%20experience (Microsoft's AI chatbot, Copilot, uses Bing search).

and included a series of unduly burdensome requests for information, presumably to ascertain an amount of "compensation" to demand.  Defendants' threat, which included reference to a separate litigation brought by Defendants against a third party in which Defendants seek statutory damages, indicates Defendants' intention to seek potentially **billions** of dollars in statutory copyright damages against Brave.

32.    But Brave's actions are not infringement, nor do they breach any contract.  Instead, they are fair use.  The asserted copyright-protected works are being used in a transformative way—to offer a search engine, which none of Defendants do.  Brave also uses its search functionality to improve the results of third-party chatbots.  Defendants also do not offer anything comparable to that.  While Defendants may license their works for LLM training, that is not the same thing Brave offers.  Defendants do not undertake the massive effort that Brave and other search engines do to index the web and then identify third-party content that is relevant to user queries.  As a result, they cannot offer a chatbot the ability to step into the shoes of a search engine user to rapidly deploy searches necessary to provide accurate, up-to-date responses to user queries at the point of inference. The remaining fair use factors also make clear that Brave's actions are allowed.  Defendants' works, largely news reporting articles, are heavily factual, and the snippets represent just a small percentage of the works.  And Defendants themselves benefit from Brave's maintenance of a search engine—as noted above, Brave always attributes the sources of third-party content, including from Defendants' websites, which may promote user traffic to Defendants' websites and articles. Meanwhile, Defendants' breach of contract allegations are expressly preempted by the federal Copyright Act and otherwise fail because Brave did not agree to Defendants' contracts of adhesion.

33.    Defendants, sophisticated parties with sophisticated counsel, know all this.  But they nonetheless have made unwarranted demands of Brave, seemingly in hopes that the threat of company-killing statutory damages will force Brave to submit to unwarranted payment demands for the right to interact with their website content—which includes not only copyright-protected material but also website content not protected by copyright, thereby unlawfully expanding Defendants' rights under the law (even setting aside fair use).  This is copyright misuse.

BRAVE'S COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT, COPYRIGHT MISUSE, AND NO BREACH OF CONTRACT                                                    CASE NO. 25-2503

34.    The law does not, and should not, allow Defendants to prevent Brave's legitimate fair use and force Brave to agree to pay to use content that is not protected by copyright by threatening company-ending statutory damages.  If Defendants can, and if they can force an exorbitant payment demand on Brave, it will deprive consumers of a preferred choice of a privacy-focused search engine, and one that is independent of Big Tech.

35.    The broader ramifications of Defendants' conduct, if approved or left unchecked, would make entry into the search engine market incalculably more difficult, leaving it likely inaccessible to all but those companies who already have such massive resources—like Google, a $2 trillion company—impairing the development of GenAI in the process.

36.    As a result, this case has serious implications for competition, data privacy, and the future of technology—and whether that future of technology will be free for all to compete in or whether we will hand it exclusively to existing technology giants.

## NATURE OF THE ACTION

37.    This is an action under the Copyright Act, 17 U.S.C. § 101 *et seq.*, the common law, and the Declaratory Judgment Act, 28 U.S.C. § 2201 and 2202 that seeks declaratory judgments of no copyright infringement, copyright misuse, and no breach of contract.

## THE PARTIES

38.    Plaintiff Brave is a Delaware corporation with a principal place of business in San Francisco, California.

39.    Defendant News Corp is a Delaware corporation with a principal place of business in New York, New York.

40.    Defendant Dow Jones is a Delaware Corporation with a principal place of business in New York, New York.  Dow Jones is a wholly owned subsidiary of News Corp.

41.    Defendant NYP Holdings is a Delaware Corporation with a principal place of business in New York, New York.  NYP Holdings is a wholly-owned subsidiary of News Corp.

42.    Defendant News Corp UK is a British company with a principal place of business in London, United Kingdom.  News Corp UK is a wholly-owned subsidiary of News Corp.

43.     News Corp Australia is an Australian company with a principal place of business in Sydney, Australia.  News Corp Australia is a wholly-owned subsidiary of News Corp.

## JURISDICTION AND VENUE

44.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 2201 and 28 U.S.C. §§ 1331, 1338(a), and supplemental jurisdiction over Brave's breach of contract declaratory judgment claim pursuant to 28 U.S.C. § 1367.

45.     This Court has personal jurisdiction over Defendants because (a) Brave resides and is being harmed in this District and (b) a substantial portion of the events giving rise to the lawsuit occurred within this District, including Brave's development of the technology that Defendants contend infringes their intellectual property and Defendants' sending a demand letter and litigation threat to Brave in this District that accuses Brave of infringing Defendants' intellectual property rights in this District.

46.     Defendants News Corp UK and News Corp Australia are alternatively subject to jurisdiction in any state's court of general jurisdiction and therefore personal jurisdiction over News Corp UK and News Corp Australia in this Court is proper pursuant to Fed. R. Civ. P. 4(k)(2) based on their contacts with the United States.

47.     Venue is proper in this judicial District for all claims under 28 U.S.C. §§ 1391(b)(2) and 1391(b)(3).

## FACTUAL BACKGROUND

**A. Brave's Disruptive Business**

48.     Brave offers a search engine called Brave Search.  Brave Search has a very small share of the entire search market, but it is currently one of the most rapidly growing search engines.

49.     Brave's search engine fills a void in the marketplace.  The marketplace is dominated by Google, which has well-documented privacy issues, including the company's practice of collecting, sharing, and selling its users' data.  Bing, which holds much of the remaining search market share, similarly collects and leverages user data.[14]

---

[14] Microsoft, *How Microsoft Stores and Maintains Your Search History*, https://support.microsoft.com/en-us/windows/how-microsoft-stores-and-maintains-your-search-

50.    Brave does not collect, share, or sell its users' data.  Brave is built as a search engine that respects its users' privacy, and it is being adopted by users who value these considerations.

51.    Brave is small, but its user base is growing rapidly, and its differentiated offering presents a threat to incumbent players in the market.

52.    To offer a search engine, Brave, like any other search engine, needs to index the internet.  Search engine indexing is the process where a search engine browses the web, discovers and analyzes website content, and then indexes or collects content and information to store in a central database (called an index) so that the search engine can retrieve and display relevant pages in search results when a user queries for information.  These functions are what allow search engines to organize and categorize web pages to make them easily searchable, creating the search engines users are familiar with today.

53.    Brave accesses and indexes publicly available webpages, including those owned by Defendants, which enables Brave to return links to these pages and limited third-party content directly relevant to a user query as results in response to user searches.

54.    Brave's search results do not provide users with the full content or full text of any third-party webpage.

55.    Brave only accesses and indexes content that a provider has made available to all internet users.  For example, Brave never accesses or indexes content that a provider places only behind a paywall, or for which a provider requires login and password information.

56.    Brave's search results also, where appropriate, contain short, summarized answers to user queries, like other search engines do.

57.    Brave's summaries are written by an AI-powered feature that summarizes third-party content in the form of a natural language response to a user's question as exemplified below:

---

history-8742470a-9fb5-c05b-a2ad-
5521cace2641#:~:text=When%20you%20search%20using%20Bing,Microsoft%20uses%20your%
20search%20history.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19     58.     Brave's summaries are accompanied by citations to the sources that were drawn on

20 and links to those websites.

21     59.     Similar to many other search engines, Brave offers a feature Brave calls "snippets."

22 Snippets provide richer information (such as locations, lists, direct answers, featured descriptions,

23 etc.) in a "preview" format at the top of search results pages.

24     60.     Brave's "snippets" are short, verbatim excerpts of third-party content that represent,

25 on average less than 1% of third-party content.  The "snippets" are accompanied by citations and

26 links back to the original third-party content, a feature enabled by Brave's use of verbatim snippets.

27 Google and Bing also provide search results with snippets.

28

61.     Depending on the search query, Brave may create more than one and up to five snippets, often from multiple sources, that are uniquely tied to the specific search.  For searches performed by human users, Brave provides a single snippet excerpt for each website in the search result.  For chatbot searches through Brave Search APIs, Brave may provide up to five snippet excerpts to facilitate the task being performed by the chatbot.

62.     Snippets content is generated from the Brave Search index, as well as through an AI model that analyzes pages and extracts the snippet of text most relevant to the user's query.

63.     One way Brave earns revenue is through its Brave Search API offering.

64.     Through Brave Search API, Brave provides search APIs to third parties operating LLMs.

65.     LLMs are a subcategory of GenAI models that have been designed to process and understand natural language inputs (also known as prompts), and predict and generate responsive text like a human.  LLMs are trained to understand language patterns, semantics, and context surrounding a given prompt, and then employ probabilistic techniques to determine the specific word, phrase, or sequence of phrases that are likely to occur in response to a given prompt.

66.     LLMs often support chatbots, or computer programs that simulate human conversations with users.  Users provide a text input to a chatbot, which guides the LLM's response generation process by laying out the context for the LLM to understand the user's desired response.  Once an LLM receives an input, it relies on its training to provide accurate, reliable responses to the user.

67.     In response to user queries, a chatbot "infers" an answer based on data.  Through Brave's Search APIs, Brave allows third-party chatbots to essentially step into the shoes of a Brave search engine user and leverage Brave's search technology at the time of "inference"— the moment the chatbot "infers" an answer to the user's query based on data.  Brave's Search APIs provide the chatbot with real-time Brave search results, which include links to third-party webpages and snippets from those webpages, allowing the chatbot to provide accurate, up-to-date responses to user queries.

68.     Google and Bing, the two dominant search engines, browse and index the internet to collect and use similar data for this precise purpose.

69.     The data Brave allows third-party chatbots to access for inference includes the snippets that Brave generates from third-party content and which search engine users see when previewing content available through a third-party link.

70.     Brave also includes "alternate snippets for AI" which also are collected from third-party content, but which are not presented to search engine users as content previews.  These alternate snippets also are limited to 300 characters per snippet, with each snippet comprising on average less than 1% of third-party content.  In this context, Brave's Search API may provide up to five "snippets" per website for use by GenAI chatbots.

71.     In addition to snippets, Brave's Search APIs include "Schema enriched Web results," an enriched set of structured data about a webpage that better represents and describes the page.  For example, a standard (non-enriched) search result for a *Rotten Tomatoes* movie review page might contain basic info like URL, title, and synopsis.  By contrast, Brave's schema-enriched result for the same movie page might include this basic info plus a thumbnail image; attributes like release date, director, actors, and rating; and even show review scores.  Beyond movies, Brave Search can enrich search results with many types of data, on many kinds of pages, including for videos, articles, products, recipes, software, books, contact information, and more.

72.     The data set also includes metadata about third-party content that can be leveraged to ensure responses are up to date.  And third parties have used Brave's Search APIs with great success.

73.     Additional third-party chatbot makers use Brave search APIs as well, including Cohere, Mistral AI, and You.com, which represent alternatives to chatbots offered by Big Tech giants.

**B.  Defendants Threaten Litigation to Curtail Brave's Legitimate Fair Use**

74.     Defendants are a group of publishing companies in the News Corp family of entities.

75.     Defendants publish papers and entertainment outlets such as the *Wall Street Journal*, *New York Post*, *The Sun*, *The Times*, *Financial News*, *Barron's*, and *Harper Collins*, among others.  Defendants make articles and other content available on their many websites, including wsj.com,

marketwatch.com, barrons.com, factiva.com, djindexes.com, dowjones.com, djnewswires.com, harpercollins.com, realtor.com, storyful.com, and nypost.com, among many others.

76.    Defendants make billions of dollars of revenue each year; collectively, Defendants own thousands, if not tens of thousands, of registered copyrighted works.

77.    On February 27, 2025, Defendants sent Brave a letter, attached as **Exhibit A**, directed to Brave's CEO, threatening litigation, alleging that Brave infringed Defendants' copyrights and breached their terms of use by accessing their publicly available websites to provide Brave's search functionality.

78.    Defendants specifically alleged that Brave is "unauthorizedly and unlawfully misappropriating News Corp's copyrighted content."

79.    Defendants complain about three core Brave search functionalities: indexing, summaries, and snippets.

80.    First, Defendants complain that Brave indexes publicly accessible internet content to operate a search engine, alleging that "Brave scrapes News Corp websites without identifying itself and without authorization," to create Brave's "search index."

81.    Defendants also allege that Brave's indexing is illegal because Brave "includes the scraped copyrighted News Corp content into a search index that Brave licenses and sells to third parties via its Search API, in competition with News Corp's own licensing and other monetization opportunities."

82.    Defendants also complain about Brave's paraphrased summaries, writing that "Brave's Summarizer provides 'comprehensive answer[s]' related to 'real-time information that is up to date with today's events'" that "include significant portions of News Corp content and are deliberately designed to siphon away traffic (along with attendant advertising, subscription and licensing revenues) from News Corp's news publications."

83.    Finally, Defendants complain about Brave's snippets, which are provided as previews to search engine users and to customers of Brave Search API who operate chatbots. Defendants specifically allege that Brave, via its Brave Search API offering, provides "'snippets' that are comprised of verbatim sentences and paragraphs of news articles, totaling hundreds of

words." Defendants complain that "Brave has no legal right to scrape News Corp's content for the purpose of selling that content to others."

84.    Based on the foregoing, Defendants allege that Brave has engaged in copyright infringement, including because Brave has made "unlawful reproductions that are a commercial substitute for News Corp's original works," and that Brave has "violat[ed] News Corp's terms of service."

85.    Defendants' letter demands that Brave cease and desist from accessing Defendants' publicly available websites and "demand[s] compensation for all past unauthorized use and sale by Brave of News Corp's copyrighted content."

86.    In the same letter containing these accusations, Defendants referenced a case they filed against a third party, Perplexity AI, Inc. in which Defendants allege infringement of many registered copyrights and seek statutory damages.

87.    Defendants' letter also demanded that Brave provide various information for Defendants to ascertain an amount of "compensation" to demand:

   a) "The list of AI firms that obtained News Corp's content through Brave's Search API and, separately, Brave's Summarizer";

   b) "The user agent(s) and IP addresses for all crawlers that Brave uses upon News Corp websites";

   c) "Any policies or technical specifications that limit the amount of web content that Brave packages into 'alternate snippets'";

   d) "The commercial terms on which Brave provides its customers with access to News Corp websites via Brave's Search API, including guardrails set for creating derivative content, if any"; and

   e) "The total number of individuals to which Brave has provided access to 'Summaries' that incorporate text from News Corp's articles."

88.    Defendants' letter directed Brave to agree to their demands by no later than 14 days from receipt.

89.     Brave denies that any conduct Defendants complain of amounts to either copyright infringement or breach of contract.

90.     Based on decades of legal precedent and practice, Brave's search service is legal fair use permitted under the Copyright Act, 17 U.S.C. § 107, including because Brave's use of Defendants' copyright-protected works is transformative.  That is because, unlike Brave, Defendants do not offer a search engine or search APIs.  The additional fair use factors also weigh towards fair use because Defendants' works (largely news articles) are factual, Brave uses no more of these works than is necessary to maintain its search engine, and Brave's search engine benefits Defendants by driving internet traffic to their websites.

91.     Defendants also have no viable breach of contract claim against Brave as a matter of law.  Defendants' terms of service provisions that prohibit accessing and using their website content except under certain conditions are preempted by the Copyright Act.  Defendants attempt to restrict access to and use of their website content.  The subject matter of the claim—website content—falls within the scope of the Copyright Act.  The rights being asserted—limiting use of and access to this content—are equivalent to copyright rights under 17 U.S.C. § 101.

92.     In addition, Brave did not agree to Defendants' click-wrap and browse-wrap terms of use, which are contracts of adhesion that violate public policy.

93.     With no viable copyright or contract claim, Defendants' payment demands amount to copyright misuse.  That is, first, because Defendants seek to leverage their copyrights to prohibit lawful fair use, or force Brave to pay unwarranted "compensation" for Brave's fair use.  And that is, second, because Defendants seek to leverage their copyrights in an anticompetitive manner, that runs contrary to public policy, and seeks to unlawfully extend their copyright rights beyond their lawful scope because Defendants' letter demands that Brave pay to access and use "News Corp content" generally, without any regard to what is protected by copyright or not.  At the same time, Defendants' website terms of service prohibit and restrict access to and use of content generally, without regard to whether content is protected by copyright or not.  And Defendants, accordingly, demand that Brave pay "compensation" for past access to their website content generally, without regard to whether content is protected by copyright or not.  Defendants also demand that Brave cease

using Defendants' content, notwithstanding that Brave's conduct is protected fair use and that much of the content is not protected by copyright. But a copyright holder has no right to leverage its copyright to restrict use of and access to material not protected by copyright. Nor does a copyright owner have the right to threaten parties to restrict them from engaging in fair use. That is copyright misuse.

## **FIRST CLAIM FOR RELIEF**

### **(Declaratory Judgment of Non-Infringement)**

94.     Brave repeats and realleges each and every allegation set forth above.

95.     Defendants assert that Brave's browsing, indexing and extracting limited data from Defendants' websites (which Defendants characterize as "crawling" and "scraping") for Brave to index the webpages and operate a search engine, summarize content, and create small snippet excerpts of content, as described above, infringes upon and violates Defendants' alleged copyright rights.

96.     Defendants have accused Brave of infringement in a letter threatening litigation, demanding that Brave cease the conduct at issue and pay Defendants compensation for alleged past infringement, and demanding, among other things, and that Brave provide Defendants with information Defendants would rely upon to demand a payment amount for Brave's past use of Defendants' works.

97.     But Brave's actions are not infringement because they are protected fair use under 17 U.S.C. § 107, including because Brave uses Defendants' copyright-protected works—the content on Defendants' publicly available websites—in transformative ways that enable Brave to offer a search engine platform to individuals and search APIs to LLMs, services that Defendants themselves do not provide.

98.     An actual, present, and justiciable controversy exists between Brave and Defendants concerning Brave's fair use of Defendants' publicly available website content—namely whether Brave has infringed any copyright-protected works, and will continue to infringe these works, by accessing, indexing, summarizing, and creating snippets of Defendants' publicly available websites as necessary to perform core search engine functions.

99.    Brave seeks a declaratory judgment that its use of Defendants' publicly available website content as described above does not infringe Defendants' copyright rights and does not otherwise violate any of Defendants' alleged interests under 17 U.S.C. § 101 *et seq.*

100.    The Court's resolution of this claim will serve a useful purpose in clarifying the legal relations at issue and will terminate all aspects of the controversy between the parties because the parties' dispute centers on whether Brave's accessing and using Defendants' content as described above is permitted under the law.

101.    Under 17 U.S.C. § 505, Brave is entitled to recover its attorney fees and the full costs of this action.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment of Copyright Misuse)

102.    Brave repeats and realleges each and every allegation set forth above.

103.    Defendants assert that Brave's browsing, indexing and extracting limited data from Defendants' websites (which Defendants characterize as "crawling" and "scraping") for Brave to index the webpages and operate a search engine, summarize content, and create small snippet excerpts of content, as described above, infringes upon and violates Defendants' alleged copyright rights.

104.    Brave's actions are not infringement because they are protected fair use, as described above.

105.    Nonetheless, Defendants are attempting to leverage their registered copyrights to prevent Brave from engaging in this lawful conduct, including by sending Brave a threat to sue Brave and a demand for extortionate "compensation" which is not required under Copyright law.

106.    In doing so, Defendants are attempting to use their limited copyright interests to exert a monopoly over all uses of their copyright protected works, including by preventing fair use.

107.    Defendants also are attempting to use their limited copyright interests to force Brave to pay to access "News Corp content" generally, without any regard to what is protected by copyright or not.

BRAVE'S COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT, COPYRIGHT MISUSE, AND NO BREACH OF CONTRACT                                                                CASE NO. 25-2503

108.    Defendants' actions constitute copyright misuse: an attempt to monopolize the legitimate use of their publicly available works, contrary to public policy and the limited exclusive rights granted under 17 U.S.C. § 101 *et seq.* and the United States Constitution Art. I, § 8, cl. 8, as specifically limited by 17 U.S.C. § 102, which limits copyright protection to "original works of authorship fixed in any tangible medium of expression," and 17 U.S.C. § 107, which provides for fair use as a limitation on a copyright holder's exclusive rights.

109.    An actual, present, and justiciable controversy exists between Brave and Defendants concerning Brave's fair use of Defendants' publicly available website content—namely whether Brave has infringed any copyright-protected works, and will continue to infringe these works, by accessing, indexing, summarizing, and creating snippets of Defendants' publicly available websites as necessary to perform core search engine functions.

110.    Brave seeks a declaratory judgment that Defendants' threatened or purported enforcement of an exclusive rights to prevent and punish Brave's fair use and Brave's use of materials not protected by copyright, as described above, constitutes copyright misuse, precluding any purported infringement claim by Defendants against Brave under 17 U.S.C. § 101 *et seq.* based on Brave's use of Defendants' website content to index the webpages and operate a search engine, summarize content, and create small snippet excerpts of content, as described above.

111.    The Court's resolution of this claim will serve a useful purpose in clarifying the legal relations at issue and will terminate all aspects of the controversy between the parties because the parties' dispute centers on whether Brave's accessing and using Defendants' content as described above is permitted under the law.

112.    Under 17 U.S.C. § 505, Brave is entitled to recover its attorney fees and the full costs of this action.

### THIRD CLAIM FOR RELIEF

### (Declaratory Judgment of No Breach of Contract – Terms of Service)

113.    Brave repeats and realleges each and every allegation set forth above.

114.    Defendants assert that Brave is "violating News Corp's terms of service," which are browse-wrap and/or click-wrap contracts of adhesion that violate public policy, by "scrap[ing] News

Corp websites without identifying itself and without authorization, and [by] includ[ing] the scraped copyrighted News Corp content into a search index that Brave licenses and sells to third parties."

115.    The conduct Defendants complain of cannot amount to breach of contract because the allegations at issue sound in copyright law.  Indeed, Defendants allege that the breach at issue is the unauthorized use and distribution of "copyrighted News Corp content."

116.    As a result, Defendants' purported contract claims concern the subject matter and rights that fall within the scope of the federal Copyright Act.

117.    Defendants' purported contract claims are, therefore, preempted by the Copyright Act.

118.    Defendants' breach of contract allegations also fail because Defendants cannot show that Brave actually agreed to their terms of use, which are browse-wrap and click-wrap contracts of adhesion for which there was no contract formation.  Those purported contracts also are contrary to public policy.

119.    An actual, present, and justiciable controversy exists between Brave and Defendants concerning Brave's use of Defendants' publicly available website content and whether this conduct amounts to breach of Defendants' terms of service, which, according to Defendants, prohibit and restrict "scraping."

120.    Brave seeks a declaratory judgment that its use of Defendants' publicly available website content as described above does not amount to breach of contract, including because the terms of service provisions at issue are preempted by the federal Copyright Act under 17 U.S.C. § 301 and because Brave did not agree to the browse-wrap and click-wrap contracts at issue.

121.    The Court's resolution of this claim will serve a useful purpose in clarifying the legal relations at issue and will terminate all aspects of the controversy between the parties because the parties' dispute centers on whether Brave's accessing and using Defendants' content as described above is permitted under the law.

## **PRAYER FOR RELIEF**

Brave respectfully requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it the following relief, including but not limited to:

a) An order declaring that Brave's use of Defendants' copyright-protected articles and other works available on Defendants' websites that Defendants may assert as infringed does not infringe upon, impair, or violate any federal, state, or common law rights, including any copyright interest, that Defendants may have or allege to have in the their works;

b) An order declaring that Defendants' threatened or purported enforcement of copyright rights with respect to Brave's use of Defendants' copyright-protected articles and other works available on Defendants' websites that Defendants may assert as infringed constitutes copyright misuse, precluding any purported infringement claim by Defendants against Brave under 17 U.S.C. § 101 *et seq.* for infringement of these works.

c) An order declaring that Brave has not breached any provision of Defendants' terms of use, including because Defendants' purported contract allegations based on Brave's "scrap[ing] News Corp websites without identifying itself and without authorization, and [by] includ[ing] the scraped copyrighted News Corp content into a search index that Brave licenses and sells to third parties" are preempted by the Federal Copyright Act and because Brave did not agree to Defendants' click-wrap and browse-wrap contracts of adhesion at issue;

d) An Order requiring Defendants to pay Brave's costs and attorney fees in this action pursuant to 17 U.S.C. § 505 and other applicable statutes and laws;

e) An award of any applicable prejudgment and post-judgment interest according to law; and

f) Such other and further relief as the Court may deem appropriate, including without limitation all remedies provided for under any other applicable laws.

## **JURY DEMAND**

Brave respectfully demands a jury trial pursuant to Fed. R. Civ. P. 38 on all issues so triable.

Brave's Complaint for Declaratory Judgment of Non-Infringement, Copyright Misuse, and No Breach of Contract                                                          Case No. 25-2503

Dated: March 12, 2025

Respectfully submitted,

By: */s/ Andrew S. Ong*

ROBERT D. CARROLL (*pro hac vice* forthcoming)
*RCarroll@goodwinlaw.com*
**GOODWIN PROCTER** **LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: +1 617 570 1000

ANDREW S. ONG (SBN 267889)
*AOng@goodwinlaw.com*
**GOODWIN PROCTER** **LLP**
601 Marshall Street
Redwood City, CA 94063
Tel.: +1 650 752 3100

TIMOTHY KEEGAN (*pro hac vice* forthcoming)
*TKeegan@goodwinlaw.com*
**GOODWIN PROCTER** **LLP**
620 Eighth Avenue
New York, NY 10018
Tel.: +1 212 813 8800

ISHIKA DESAI (SBN 340239)
*IDesai@goodwinlaw.com*
**GOODWIN PROCTER** **LLP**
525 Market Street, Floor 32
San Francisco, CA 94105
Tel.: +1 415 733 6316

Attorneys for Plaintiff
BRAVE SOFTWARE, INC.